UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES T. CASSIDY AND FAITH H. CASSIDY, individually and as representatives of others similarly situated | CIVIL ACTION |
| | NO. 15-2483 |
| VERSUS | |
| FORD MOTOR COMPANY | SECTION "N" (4) |

<u>**ORDER AND REASONS**</u>

Before the Court is Defendant Ford Motor Company's ("Ford" or "Defendant") "Motion to Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)" (Rec. Doc. 4). Having carefully considered the Motion to Dismiss; Plaintiffs James and Faith Cassidy's ("Plaintiffs") Memorandum in Opposition (Rec. Doc. 15); Defendant's Reply (Rec. Doc. 19); Plaintiffs' Sur-Reply in Opposition (Rec. Doc. 23); Defendant's Sur-Reply in Support (Rec. Doc. 26); Plaintiffs' Notice of Supplemental Authority (Rec. Doc. 27); the applicable law; and the record; the Court now issues this Order and Reasons.

**I. Background**

This action arises from an alleged defect in a 2013 Ford Explorer Limited purchased by Plaintiffs James and Faith Cassidy from Don Bohn Ford, an authorized Ford Dealership located in Harvey, Louisiana. (Rec. Doc. 1 at ¶ 14). When purchased and delivered in May of 2013, Plaintiffs allege that the Explorer was, and continues to be, dangerous and defective due to the introduction of exhaust fumes and other gases, including carbon monoxide, into the passenger compartment during operation of the vehicle. (*Id.* at ¶ 15). This occurrence, they claim, is a result of a defect in the vehicle's design and its exhaust and/or HVAC systems. (*Id.*). According to the complaint, at the

time of the vehicle's purchase, Plaintiffs were notified of neither the defect nor the presence of potentially dangerous gases inside the vehicle. (*Id.* at ¶ 15).

Within about a week of their purchase, Plaintiffs first noticed the presence of exhaust in the cabin while driving from their home in Covington, Louisiana to Orlando, Florida. (*Id.* at ¶ 17). On or about July 13, 2013, Plaintiffs brought the vehicle to their dealership, Don Bohn Ford, for a service visit. (*Id.* at ¶ 18). While there, they complained about the exhaust odor and provided the dealership with the Ford Technical Safety Bulletin ("TSB") 12-12-4, (*Id.* at ¶ 18), which sets forth a service procedure for correcting the complained of occurrence. (*See* Rec. Doc. 15-1). The dealership held Plaintiff's Explorer for eight days and completed TSB 12-12-4 during that time. (*Id.* at ¶ 21). However, TSB 12-12-4 did not remedy the problem, as Plaintiffs continued to smell exhaust fumes while using their vehicle. (*Id.* at ¶ 22).

Plaintiffs returned to the dealership just days later, only to be told that no remedy then existed to fix the problem. (*Id.* at ¶ 23). However, Plaintiffs were assured that Ford was aware of the problem, and that it would eventually be fixed. (*Id.* at ¶ 24). Months later, on or about September 10, 2014, Plaintiffs took their vehicle to a different authorized Ford Dealer, Banner Ford, to have a subsequent TSB, 14-0130, performed. (*Id.* at ¶¶ 25, 26). Again, the service procedure failed to correct the defect. (*Id.* at ¶ 27). When Plaintiffs called Banner Ford on September 15, they were promised that a fix for the problem would be available in December, 2014. (*Id.* at ¶ 29)

Plaintiffs then contacted Ford Motor Company directly. (*Id.* at ¶ 30). Ford directed Plaintiffs to an internal grievance procedure found in its warranty booklet. (*Id.* at ¶ 30). Pursuant to its terms, Plaintiffs initiated the grievance procedure  in October of 2014 by submitting a claim form. (*Id.* at ¶ 30). They then participated in a non-binding arbitration proceeding, administered by the Better

Business Bureau ("BBB"), on January 2, 2015. (*Id.* at ¶¶ 31, 32). The arbiter ultimately denied Plaintiffs' warranty claim. (*Id.* at ¶32). To date, Ford has not repaired the vehicle. (*Id.* at ¶ 33).

Plaintiffs filed the instant lawsuit on July 7, 2015, pressing the following two claims against Ford: Count I – Breach of Warranties Against Redhibitory Defects, under La. Civ. Code. Art. 2520 and 2524; and Count II – Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* Ford now moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the suit in its entirety for failure to state a claim upon which relief can be granted.

## II. Law and Analysis

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).   Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*   Rather, the allegations contained in a complaint "must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citations omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, *i.e.*, the type of claim at issue).   And, in evaluating motions to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), the Court "must

accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th Cir.), *cert. denied,* 476 U.S. 1159 (1986).  Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor."  *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir. 2001). Nevertheless, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – "that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 678 (quoting Fed. R. Civ. P. 8(a)(2)).

### A. Plaintiffs' Art. 2520 Claim and Limiting Theories of Recovery

Ford first asserts that, to the extent Plaintiffs' claim for breach of implied warranties is premised on Louisiana Civil Code article 2520, it should be limited. (Rec. Doc. 4-1 at p. 5). There are two ways that a defect may be redhibitory under article 2520, and each entails a distinct right of recovery. *See* La. Civ. Code Art. 2520. Specifically, article 2520 provides:

> The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
>
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
>
> A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

Arguing that the complaint contains neither an allegation that the defect has rendered the vehicle totally useless nor any facts supporting rescission of the sale, Ford moves to narrow Plaintiffs' article 2520 claim and any recovery thereunder to a diminution of value theory.  However, Plaintiffs clarify in their briefing that they do not seek a rescission of sale and that such a limitation from the Court

is unnecessary. Accordingly, based on Plaintiffs' representation to the Court, this portion of Ford's Motion is **DENIED AS MOOT, without prejudice.**

### B. Plaintiffs' Implied Warranty Claim under Art. 2520 and 2524

Ford next argues for the dismissal of Plaintiffs' claim under article 2524[1] because such claims "are not permitted against a product manufacturer when the defect alleged is of a type that would otherwise give rise to a redhibition claim under Article 2520 or a product liability claim under Louisiana Products Liability Act." (Rec. Doc. 4-1 at p. 6). The Court disagrees.

Courts in the Western District of Louisiana have addressed the question of whether a plaintiff, who has alleged that a product has a redhibitory defect (art. 2520), can also argue that the redhibitory defect renders the product unfit for its ordinary use (art. 2524). *See Sw. Louisiana Hosp. Ass'n v. BASF Const. Chemicals, LLC*, 946 F.Supp.2d 661, 690-92 (W.D.La. 2013) and *Justiss Oil Co., Inc. v. T3 Energy Servs., Inc.*, 2011 WL 539135 at *6 (W.D.La. Feb. 7, 2011). In both instances cited, the court held that, as long as the shorter prescriptive period for the article 2520 claim has not expired, nothing precludes a plaintiff from bringing an additional claim under article 2524. *See BASF*, 946 F.Supp.2d 661 at 692; *Justiss Oil Co.*, 2011 WL 539135 at *6. To arrive at this conclusion, the *Justiss* court relied on the "well-settled rule that the same acts or omissions may

---

[1] La. Civ. Code art. 2524 creates a warranty of fitness and provides:

The thing sold must be reasonably fit for its ordinary use.

When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.

If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations.

constitute breaches of both general duties and contractual duties and may give rise to actions in both tort and contract." *Id.* (citations omitted). After examining Louisiana jurisprudence, the court concluded that "[b]ased on that rule, Louisiana law has long held that . . . a plaintiff may assert claims under both theories and is not required to plead a single theory of his case." *Id.* (citations omitted); *see also BASF*, 947 F.Supp.2d 661 at 692 (holding that, because the one-year prescriptive period on the Hospital's redhibition claim had not expired, the plaintiff was free to assert claims under both art. 2520 and art. 2524).[2]

Here, Ford has not convinced the Court that a departure from the rationale of the *Justiss* and *BASF* decisions is warranted. While it is true that the article 2524 claim may not later survive a summary judgment challenge, Ford has not demonstrated why, at this early stage in the proceedings, Plaintiffs should be precluded from bringing it now. Therefore, the Court finds that Plaintiffs may assert – and have asserted – claims under both articles.

Ford further contends that Plaintiffs' article 2524 claim is prohibited by the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq.* This argument also fails. "[T]he LPLA governs products liability in tort and recovery under the statute will normally be limited to recovery for personal injury and damage to property other than the product itself, which properly are the subject of a products liability tort claim." *Southwest Louisiana Hospital Ass'n v. BASF Construction Chemicals, LLC*, 947 F. Supp.2d 661, 685 (W.D. La. 2013)(citing and quoting Kennedy, A PRIMER

---

[2]     The undersigned recognizes that the *BASF* court later amended its opinion in order to strike the affirmative finding that the plaintiff was permitted to assert an article 2524 claim, in addition to an article 2520 claim. *BASF*, 947 F.Supp.2d 661 at 701-02. However, the decision to amend was a result of the plaintiff's subsequent failure, on summary judgment, to adduce facts in support of the article 2524 claim, as opposed to a revelation of law. Therefore, the amended opinion does not detract from the court's sound legal analysis.

ON THE LOUISIANA PRODUCTS LIABILITY ACT, 49 La. L. Rev. 565, 580 (1989); *see also* La. R.S. § 9:2800.52 (The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage *caused by a product* on the basis of any theory of liability that is not set forth in this Chapter.") (emphasis added). In contrast, a claim in redhibition for breach of implied warranty seeks "[r]ecovery for damage to the product itself or economic loss arising from a deficiency in or loss of use of the product." *Id.* at 685-86. Such a claim does not invoke the LPLA, with one caveat: "a claimant can recover under the LPLA for damage to the product itself and economic loss when for some reason he cannot proceed in redhibition." *BASF*, 947 F. Supp.2d 661, at 686.

Similar to their article 2520 claim, Plaintiffs' article 2524 claim seeks to recover for economic loss arising from the vehicle itself, not damage to other property or damage from personal injury. Neither claim is precluded by the LPLA and its exclusive theories of liability. Accordingly, as far as Ford's Motion to Dismiss pertains to Plaintiffs' article 2524 claim, it is **DENIED**.

### C. Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") Claim

Ford moves to dismiss Plaintiffs' Count II MMWA claim on the grounds that Plaintiffs (1) do not state a plausible breach of express warranty theory against Ford and (2) do not identify which breach of implied warranty supports their Magnusson-Moss claim. (Rec. Doc. 4-1 at p. 7-13). "[T]he MMWA creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty, implied warranty, or service contract.'" *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 474 (5th Cir. 2002) (citing 15 U.S.C. § 2310(d)(1)) (alterations in original). The Act defines the term "implied warranty" according to state law. *See* 15 U.S.C. § 2301(7). It defines the

term "express warranty" to mean:

> (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
>
> (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,
>
> which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

*Id.* at § 2301(6)(A)-(B). Ford argues the statute does not create independent warranty obligations and, as a result, a state law claim for breach of express warranty is a prerequisite. In effect, Ford implores the Court to disregard the Act's definition of express warranty and, instead, apply that given for implied warranty. Finding the statute to be clear, the Court rejects Ford's argument and concludes that the MMWA creates a cause of action for breach of express warranty independent of state law. The question, therefore, becomes whether Plaintiffs have sufficiently identified an express warranty and pled facts that would support finding breach of said warranty.

Count II of the complaint sets forth Plaintiffs' MMWA claim. It states that the claim is premised on the breach of written and implied warranties, and it incorporates by reference all allegations made in the preceding paragraphs of the complaint. (Rec. Doc. 1 at ¶¶ 72, 77). In those paragraphs, Plaintiffs identify and discuss Ford's "warranty booklet." (*Id.* at ¶ 30). Repeated reference is also made to Technical Service Bulletins ("TSB"), which state that the work described therein is covered under the provisions of the New Vehicle Warranty Coverage. (*See id.* at ¶¶ 19, 21-23; Rec. Doc. 15-1 at p. 2, 7). The New Vehicle Warranty Coverage is found in the "2013 Model

Year Ford Warranty Guide" (Rec. Doc. 4-3), which is most assuredly the warranty booklet referenced. The complaint then proceeds to describe how Ford breached the warranties by failing to correct the alleged defect. (Rec. Doc. 1 at ¶ 80). Given the content of the complaint highlighted here, and specifically its reference to the warranty booklet, the Court finds that Plaintiffs adequately identified the 2013 Model Year Ford Warranty Guide ("Warranty Guide") as the source of the express warranty at issue.

Ford next argues that its "New Vehicle Limited Warranty" does not apply because (1) the defect alleged is one of design, rather than poor workmanship or defective materials, and (2) Ford did not warrant a defect-free vehicle.  The Court rejects the first argument for two reasons: First, Plaintiffs have alleged the vehicle is defective not only in its design, but also in the manner it was manufactured and assembled. (Rec. Doc. 1 at ¶ 37).  Second, the New Vehicle Limited Warranty does not actually exclude defects in design. Rather, the warranty provides:

WHAT IS COVERED?

Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights.

You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:

- your Ford vehicle is properly operated and maintained, and

- was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

This warranty does not mean that each Ford vehicle is defect free. Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

(Rec. Doc. 4-3 at pp. 14-15). A later section on what is not covered, the warranty makes no mention of an exclusion for design defects. (*See id.* at 18).

The Ninth Circuit recently considered this issue – whether Ford's warranty excludes design defects. *See Daniel v. Ford Motor Company*, 806 F.3d 1217, 1223-25 (9th Cir. 2015). It found the warranty to be ambiguous and, as a result, held that it covered more than just materials and workmanship. *Id.* at 1225. Explained the court, "[t]he warranty can reasonably be interpreted to either guarantee against only manufacturing defects (where the second paragraph is a general explanation and not a guarantee) or guarantee against both manufacturing and design defects (where the second paragraph expands the guarantee to design defects)." *Id.*  Because the warranty was "without question" a contract of adhesion, the Ninth Circuit concluded that the ambiguity must be construed against the drafter, Ford. *Id.*

The Court agrees with decision in *Daniel*. The warranty appears ambiguous due to the language in the second paragraph quoted above. Moreover, Louisiana's rule for handling ambiguities is similar to the rule applied by the Ninth Circuit. *See, e.g., Boguet v. Lafourche Parish Sheriff's Office*, 2000 WL 1532768, at *4 (E.D. La. Oct. 13, 2000) ("If, however, after applying the rules of construction an ambiguity remains, the Court will construe the ambiguous provision against the drafter . . .").  Therefore, the Court finds that the scope of Ford's New Vehicle Limited Warranty extends beyond materials and workmanship to cover defects in design.

Ford additionally argues for the dismissal of Plaintiffs' MMWA claim because it never warranted a defect-free vehicle, only that it would fix defects. In other words, Ford's position seems to be that, as long as it continues efforts to correct the issue, the warranty has not been breached. The Court is unpersuaded. Plaintiffs' position is not that Ford owed them a vehicle free of defects.

Rather, their grievance lies with the fact that, after repeated attempts to fix the exhaust issue, Ford failed. Certainly Ford cannot be allowed indefinitely opportunities to remedy the problem. Permitting as much would render the warranty meaningless. Therefore, in light of the multiple, unsuccessful attempts to service Plaintiffs' vehicle, and the duration of time that has passed since the defect was first discovered, the Court concludes that Plaintiffs have pled facts sufficient to support a finding that Ford breached its warranty.

Finally, Ford argues that Plaintiffs' MMWA claim, to the extent it relies on breach of implied warranties, should be dismissed for failure to identify a specific warranty. The Court, again, disagrees. As discussed *supra*, Plaintiffs have asserted in Count I a valid claim for breach of implied warranties under two theories of state law. The MMWA claim follows immediately in Count II, and it not only incorporates Count I by reference but also parrots its warranty language. (*See* Rec. Doc. 1 at ¶¶72, 79). For these reasons, the Court finds that Plaintiffs have fairly identified the implied warranty theories upon which their MMWA claim is based, at least for Rule 12(b)(6) purposes. Accordingly, this portion of Ford's Motion is **DENIED**.

## III. Conclusion

For the foregoing reasons, the Court finds Ford's Motion to Dismiss to be without merit. Accordingly, the Motion is **DENIED**.

New Orleans, Louisiana, this 19th day of February, 2016.

**KURT D. ENGELHARDT**
**United States District Judge**

11